## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.

**KIMBERLEE TESSEAN,** an individual,

      Plaintiff,

v.

**ALTITUDE SPORTS & ENTERTAINMENT, LLC**, a Colorado Limited Liability Company, and **ULTIMATE PRODUCTIONS**, a Colorado Limited Liability Company,

      Defendants.

---

### COMPLAINT AND JURY DEMAND

---

      Plaintiff Kimberlee Tessean ("**Ms. Tessean**" or "**Plaintiff**"), through her undersigned counsel, submits this Complaint and Jury Demand against Altitude Sports & Entertainment, LLC ("**Altitude**") and Ultimate Productions ("**Ultimate**," and together, "**Defendants**").

### <u>PARTIES</u>

      1.      Plaintiff is an individual who resides at 2396 South Bellaire Street, Denver, Colorado 80022.

      2.      Plaintiff is female.

      3.      Altitude is a Colorado Limited Liability Company with its principal place of business located at 1000 Chopper Circle, Denver, Colorado 80204.

      4.      Altitude is a regional sports cable and satellite television channel that is owned by Kroenke Sports & Entertainment.  Altitude regularly televises games for the Colorado Avalanche, Denver Nuggets, Colorado Mammoth, and Colorado Rapids.

5.      Ultimate is a Colorado Limited Liability Company with its principal place of business located at 8920 Scenic Pine Drive, Parker, Colorado 80134.

6.      Ultimate is a "crewing company," or "crewer," which is akin to a temporary employment agency.  Ultimate schedules technical experts to work on-location for televised sporting events in the Rocky Mountain Region, including Colorado, Wyoming, Utah, New Mexico, and Arizona.

7.      Altitude and Ultimate were joint employers of Ms. Tessean during her work at the Pepsi Center.

8.      Upon information and belief, at all times relevant to this matter, Defendants employed at least 15 employees.

## JURISDICTION AND VENUE

9.      Plaintiff brings this action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq*. ("**Title VII**").

10.     This Court has original jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343.

11.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367, as the claims arise out of the same case and/or controversy as Plaintiff's Title VII claims.

12.     Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b) because Defendants regularly conduct business in the District and because Plaintiff lived and worked in the judicial district of the United States District Court for the District of Colorado when the unlawful employment practices and other conduct alleged herein were committed.

## JURISDICTIONAL PREREQUISITE

13.     Plaintiff timely filed a Charge of Discrimination against Defendants with the Equal Employment Opportunity Commission and the Colorado Civil Rights Division (together, the "**EEOC**").  Plaintiff received Notice of Right to Sue letters, dated September 30, 2019. Plaintiff has fulfilled all conditions precedent to instituting this lawsuit, as necessary, and has otherwise exhausted her administrative remedies.

## GENERAL ALLEGATIONS

### *Employer and Employee Information*

14.     Plaintiff is an experienced operator of a piece of television production equipment called an EVS machine.  EVS is a Belgium-based company that makes equipment and software designed to take live-action video footage and create instant replays and slow-motion video, as commonly seen on television during broadcast televised sporting events.

15.     Plaintiff has 16 years of experience operating an EVS machine and 20 years working in television broadcast production, including 6 years' work as a "utility," where her main job responsibilities were set-up and tear-down of equipment used during TV broadcasts.

16.     Plaintiff began working for Altitude in 2004 as a utility, and 2006 as an EVS Operator.

17.     Plaintiff began working for Ultimate in 2015 as an EVS Operator.

18.     Plaintiff was offered, and maintained, a 401(k) retirement account with Altitude.

19.     The Pepsi Center is a multi-purpose arena in Denver and is, among other things, where the Denver Nuggets and Colorado Avalanche play their home games.

20.     Al Boileau ("**Mr. Boileau**") is the President of Ultimate.

21.     Upon information and belief, Mr. Boileau is the crewer for many, if not all, of the televised sporting events at the Pepsi Center, including the home games played by the Denver Nuggets and Colorado Avalanche.

22.     Each game played by a local sports team in Denver has two full productions crews working each game.  One crew produces the "local feed," which is what Denver-area television viewers see.  The second crew produced the "away feed," which is that the visiting team's fans see on television in their hometown.

23.     Ms. Tessean worked exclusively on the away feed for games at the Pepsi Center, which was crewed only by Ultimate.

24.     Scott Milinkov ("**Mr. Milinkov**") is a video specialist frequently crewed by Mr. Boileau to work the away feed at the Pepsi Center, and upon information and belief, is still frequently crewed by Mr. Boileau to work events in the Denver area.

25.     On October 1, 2015, Ms. Tessean signed Ultimate's Company Policies, which included the following policy: "Safety: Ultimate Productions/Crewing Source supports the individual's right to expect a safe environment.  Do not ever do anything that will put you, your fellow workers, the public, participants, or any equipment at risk."

26.     In November 2018, Ms. Tessean received Ultimate's Strike/Tear Down Policy via the Crewing Source website.  The Strike/Tear Down Policy applies to employees who had been "booked to work an event by Ultimate Productions as an at-will employee or independent contractor."

27.     Between 2017 and 2019, Ultimate used a website called "Crewing Source" to streamline its hiring of expert technicians to work games.

28.     The Crewing Source website allowed employees, including Ms. Tessean, to view and apply directly for open positions.

29.     Upon information and belief, Mr. Boileau reviewed the availability of technicians along with any team requests for specific technicians, and then assigned employees to specific games.

30.     During the 2017 – 2018 basketball and hockey seasons, employees could only work games for Altitude if Ultimate hired them.

31.     During the 2017 – 2018 basketball and hockey seasons, Ms. Tessean worked approximately 23 Altitude events at the Pepsi Center.  All were crewed by Ultimate.

32.     Following the 2017 – 2018 season, despite having open availability and applying for many open EVS Operator positions on Crewing Source, Ms. Tessean did not work any Nuggets or Avalanche games for Altitude and Ultimate.

33.     Eventually, Mr. Boileau adjusted Crewing Source so that Ms. Tessean was no longer able to apply for open positions at the Pepsi Center.

*Plaintiff's "Regular" Work Conditions*

34.     As an experienced EVS Operator, Plaintiff was no stranger to working in the male-dominated field of sports television production.

35.     Because of the nature of this highly-technical work, there is often a core group of technical employees who spend a good deal of time together working these games.  As a consequence, this core group of workers became very familiar with one another.

36. Ms. Tessean identified these male coworkers in conversations and in email communications as the "mean girls club," because she felt they conducted themselves like characters in the movie "Mean Girls."

37. Ms. Tessean, and a handful of fellow highly-skilled female employees who also worked inside the TV Truck, were definitely not included in this group of Altitude and Ultimate employees. They were treated as outcasts. The members of the "mean girls club" went out of their way to ignore Ms. Tessean, except when they were belittling her and questioning her technical abilities.

38. Ms. Tessean often overheard comments from members of the "mean girls club," such as "I wonder how many blow jobs she had to give in order to get on that show," and speculation that Ms. Tessean had to flirt or sleep with members of the production crew to get work.

39. Ms. Tessean also heard from coworkers that she has a "reputation" for being a "whore."

40. Plaintiff's work environment with Altitude and Ultimate was overrun with these sorts of comments and untrue rumors. This was ongoing banter between her male coworkers and not a rare occurrence.

41. At times during her work with Altitude and Ultimate, Ms. Tessean had as many as three female coworkers.

42. In 2017, one female employee was kissed against her will by a male supervisor in the workplace. That same supervisor also called the female employee "tits and ass" on more than one occasion. This coworker reported these incidents to Altitude and Ultimate. The male

supervisor was not terminated.  Instead, this coworker was told harassment training would be provided to everyone on the team.  No such training took place that year.

43.     The second female employee made formal complaints about the hostile environment, including verbally aggressive behavior by Mr. Milinkov, on two separate occasions in late 2017.

44.     The third female coworker reported the director of one crew who spent time during a game speaking to the crew through their headsets about oral sex he had with his wife. When she asked the director to stop, she faced taunting from male coworkers, including that she was "no fun."

45.     This behavior by Plaintiff's male coworkers, particularly that of Mr. Milinkov, was known to and tolerated by Ultimate and Altitude.

46.     This behavior continued throughout Plaintiff's employment with Defendants.

47.     In 2018, Altitude provided human resources training to employees, including anti-harassment training, and provided employee handbooks to Plaintiff and her coworkers. Employees were compensated for their time participating in the training and completing the handbook acknowledgement.

48.     On the north side of the Pepsi Center is a loading dock, where TV Trucks are routinely parked.

49.     On any given game day, there could be between 10 and 15 individuals working inside the "TV Truck" – a mobile trailer outfitted for the specific purpose of producing live television broadcasts of sporting events.

50.     The TV Truck Plaintiff and her coworkers worked in is approximately 14-feet wide and 53-feet long.

51.     Inside the TV Truck are multiple workstations for the multiple technical positions worked during each game.  These work stations include production, audio, videotape, video, and transmission.

52.     On any given game day, employees crewed to work a telecast at the Pepsi Center arrive before the game to set up, work the game, and then are required to stay for "strike" – a teardown of the equipment used during the telecast.

53.     On most game days, Plaintiff and her coworkers worked between 8 and 10 hours.

54.     Mr. Milinkov has been known to lose his temper at work, including yelling at coworkers.  This happened often during strike, which takes place at the end of the broadcast when the crew leave their individual workstations to work together on teardown.

55.     Mr. Milinkov raised his voice at Ms. Tessean on multiple occasions while the two worked at the Pepsi Center.  Ms. Tessean felt targeted by Mr. Milinkov because, upon information and belief, he believed these gender-based stereotypes about Ms. Tessean.

56.     Upon information and belief, at least two coworkers (other than Plaintiff) made separate complaints to Mr. Boileau about Mr. Milinkov's aggressive behavior and conduct at work prior to January 25, 2018.

### *The Events of Thursday, January 25, 2018*

57.     Ms. Tessean and Mr. Milinkov were both crewed by Ultimate to work the away feed at the Pepsi Center on Thursday, January 25, 2018, producing the telecast of a basketball game between the New York Knicks and the Denver Nuggets.

58.     The TV Truck that evening was parked outside the loading dock at the Pepsi Center near the eastern-most loading bay, inside a chain-link fence.

59.     There are security cameras east and west of where the TV Truck was parked that night, as well as mounted on the building facing out to the area where the TV Truck is parked.

60.     Ms. Tessean's job as an EVS Operator requires her to perform certain tasks on the EVS machine following the television broadcast.

61.     After completing the tasks related to her work as the EVS Operator, Ms. Tessean exited the truck to join in the strike process.  Plaintiff estimates the time to have been at or after 10:00 P.M. when she joined the crew already performing strike.

62.     A coworker handed Ms. Tessean an S-Pulley with a long strap to wrap up to be put away.  Ms. Tessean wrapped up the S-Pulley and strap.

63.     Not knowing exactly where this S-Pulley should be put away, Ms. Tessean approached Mr. Milinkov to ask him where to store it.

64.     Mr. Milinkov grabbed ahold of Ms. Tessean by the arm and began pulling at her.

65.     Plaintiff tried to pull herself away from Mr. Milinkov's grasp, but he would not release his grip.

66.     Ms. Tessean attempted to stand her ground, at which point Mr. Milinkov yanked her by the arm even harder.

67.     Mr. Milinkov grabbed Ms. Tessean, upon information and belief, in order to physically move her from where she was standing to where he wanted the S-Pulley put away.

68.     Ms. Tessean noticed that as he held her, Mr. Milinkov's face was distorted out of anger.

69.     Mr. Milinkov was speaking to Ms. Tessean as he grabbed her, but she was unable to focus on his words.  All Ms. Tessean recalls about the initial physical contact is that Mr. Milinkov was visually angry, acting aggressively, and physically took ahold of her without her consent.

70.     Ms. Tessean recalls that she had an immediate visceral response to Mr. Milinkov's anger and physical contact with her, stemming from a past instance of physical abuse.  Ms. Tessean believed that she was in immediate physical danger and she feared for her safety.

71.     In a panic to get Mr. Milinkov to let go of her, Plaintiff screamed as loudly as she could: "You do not have consent to touch me."

72.     She screamed "You do not have consent to touch me" multiple times before Mr. Milinkov released his grip on her.

73.     As he let go of her arm, Mr. Milinkov yanked the S-Pulley out of Ms. Tessean's hands and threw it at Ms. Tessean in anger.  The S-pulley hit her in the center of her left thigh.

74.     Ms. Tessean estimates the type and size of the metal S-Pulley and strap to weigh between five and ten pounds.

75.     After being hit in the leg, Ms. Tessean doubled over in pain.

76.     Mr. Milinkov then picked up the S-Pulley and strap up off the ground and re-wrapped it.

77.     Ms. Tessean asked Mr. Milinkov why he threw the pulley at her, to which he responded that he threw the S-Pulley because she was screaming.  Ms. Tessean told him she was screaming because he was hurting her with his grip on her arm.

78.     As she was required to do, Ms. Tessean remained at work after the incident until she was released that night to go home.

79.     As soon as she was released from work she called a New York Knicks production employee to report the incident.

80.     The next day, she reported the incident to Mr. Boileau, who involved Tim DeLay ("**Mr. DeLay**"), Altitude's Operations Manager, and, according to Mr. Boileau, Ultimate's "point person" at Altitude.

81.     Shortly after the incident, Ms. Tessean went to the police station and asked to make a report of the incident.

82.     The police advised Ms. Tessean against making a report, however, and convinced her not to file a formal complaint.

83.     Approximately two weeks later, Ms. Tessean took a photograph of the bruise that remained on her leg from where the S-Pulley hit her.

### *Plaintiff's Complaints of Hostile Work Environment*

84.     Ms. Tessean made multiple complaints about the hostile work environment she experienced while working with Altitude and Ultimate.

85.     Ms. Tessean's complaints focused on aggression from her male coworkers, particularly the bullying directed at her work during the strike process.

86.     On November 30, 2017, Ms. Tessean notified Mr. Boileau by email she had concerns about a text message she received from a camera operator the prior evening that she interpreted as a threat.  The text message was related to the strike process.

87.     On January 26, 2018, Ms. Tessean sent Mr. Boileau an email describing the "harassment and bullying" she was experiencing from male coworkers, including how Mr. Milinkov had assaulted her.  In the email, she identified these coworkers by their job titles: cameras, video, and A2s (assistant directors).  These coworkers were all male.

88.     The harassment and bullying Ms. Tessean reported was directed at Ms. Tessean, as a woman, and because of gender stereotypes.  Certain of Ms. Tessean's male coworkers targeted her based on their perception that female employees who worked technical positions inside the TV Truck (including EVS Operators, Duet Operators, and certain audio positions) were lazy, did not want to engage in the physical labor required to complete strike, and that these women needed to be taught how to do strike.

89.     These misperceptions held by certain male coworkers often lead to verbal disagreements stemming from condescension and bullying.

90.     In her January 26, 2018 email, Ms. Tessean indicates her reluctance to bring the issue with the "mean girls club" to Mr. Boileau's attention because she "was afraid it could cost [her] work."

91.     In his response to her email, Mr. Boileau stated: "I too am fed up with some of the attitude and behavior of certain members of the crew."

92.     Mr. Boileau also stated that teams had "truly enjoyed having [Ms. Tessean] on their shows this season and another tremendous review came in earlier [that] week thanking us for having you as a part of their show."

93.     Mr. Boileau immediately notified Altitude of the complaint by forwarding Ms. Tessean's email to Mr. DeLay.

94.     Mr. Boileau and Mr. DeLay at first seemed eager to investigate Ms. Tessean's allegations and planned to meet and follow-up with her as the investigation progressed.

95.     Ms. Tessean willingly participated in the investigation, including by being interviewed by Altitude's human resources department.

96.     Ms. Tessean never received a copy of the security camera footage of the incident, which she had requested from Altitude.

97.     At the conclusion of the "investigation," Ms. Tessean was told by Katie Irlando, of Altitude's human resources department, that Mr. Milinkov had been doing a lot of self-reflection and felt bad about what happened, and because Altitude believed him, they would allow him to continue working at the Pepsi Center.

98.     On February 6, 2018, Mr. Boileau sent a crew-wide email apparently in an attempt to allay concerns and clarify the strike process. In his email, Mr. Boileau, among many other things, reasserts his position as the "buffer between the crew and management" at Altitude.

99.     In response to Mr. Boileau's email, Ms. Tessean responded that same day to bring to Mr. Boileau's attention that his direction to Altitude and Ultimate's employees "opened the door" for Ms. Tessean to be "blamed" for new processes and the perceived talking to from management.

100.    In her response, Ms. Tessean writes that she has experienced "extreme anxiety" following the January 25, 2018 incident, and indicates her renewed fear of retaliation based on Mr. Boileau's email.

101.    Then, on February 7, 2018, Mr. Boileau responded via email and notified Ms. Tessean that he had a meeting scheduled that same day with Altitude to discuss a strike plan that

might address some of Ms. Tessean's concerns about members of the crew that engaged in harassment and bullying.  He also confirmed he was "here to help" in his position as a buffer between employees and Altitude.

### *Retaliation Against Plaintiff for her Complaints About Harassment and Assault*

102.    At the time of the January 25, 2018 incident, Ms. Tessean was already scheduled to work games for the Denver Nuggets and Colorado Avalanche for the remainder of their seasons.

103.    Ms. Tessean worked the remainder of the 2017 – 2018 season as scheduled and without incident.

104.    Ms. Tessean has not been crewed by Ultimate to work another game for Altitude since.

105.    Ms. Tessean has, however, been crewed by national broadcasts such as NBC, to work away feeds at the Pepsi Center for the Denver Nuggets and Colorado Avalanche games at the networks' specific insistence.

106.    Since the conclusion of the 2017 – 2018 basketball and hockey seasons, Ms. Tessean has worked a total of one series of baseball games for Ultimate and zero games for Altitude.  The baseball series she worked for Ultimate was at the specific request of the visiting team.

### *Ms. Tessean's Civil Suit Against Mr. Milinkov*

107.    On January 24, 2019, Ms. Tessean filed suit against Mr. Milinkov for Civil Assault and Battery.

108.    Shortly thereafter, Mr. Milinkov's counsel provided undersigned counsel with a copy of the security camera footage of the January 25, 2018 incident.

109.    On February 20, 2019, Mr. Milinkov made a statutory offer of settlement pursuant to Colo. Rev. Stat. § 13-17-202, which Ms. Tessean accepted in resolution of her individual claims against Mr. Milinkov.  Ms. Tessean does not seek damages related to the January 25, 2019 incident from either Altitude or Ultimate.  The incident is one example of the environment Altitude and Ultimate cultivated and allowed to continue.

110.    Upon information and belief, Ms. Tessean has been replaced by male EVS Operators.

111.    Upon information and belief, Ms. Tessean has been replaced by male EVS operators with substantially less EVS experience, leading to complaints from teams about work quality.

### Al Boileau Has Continued to Interfere With Ms. Tessean's Career

112.    Mr. Boileau acts as a crewer for the away feed at Colorado Rockies games played at Coors Field in Denver.

113.    Between 2016 and 2018, Mr. Boileau crewed Ms. Tessean for multiple series of the Colorado Rockies.

114.    "Series" refers to the string of games a visiting team plays in Denver.  These series are three to four games and/or days in a row, and are lucrative work for Ms. Tessean.

115.    Since making her complaints about the hostile work environment at Altitude, Ms. Tessean has only been crewed to work one series at Coors Field.

116.    Ms. Tessean worked the one series at Coors Field in 2019, after the visiting team requested her by name and followed-up with Mr. Boileau multiple times to be certain that Ms. Tessean was crewed to work the away feed.

117.    Ms. Tessean is aware that she has been requested by four different visiting teams to work series at Coors Field in the summer of 2019.  Mr. Boileau ignored the requests and crewed other EVS Operators for the games.

118.    When other hockey, basketball, and baseball production crews would contact Mr. Boileau about Ms. Tessean, he either would not respond or, after Ms. Tessean filed her Charge of Discrimination against Ultimate, would tell those who inquired that he could not crew Ms. Tessean because she was "suing" him.

119.    On August 9, 2019, a mass email was sent to Ultimate's employees stating that the week of August 27 to September 1 "could be the busiest and jam packed dates of events we've ever had," (all sic).  The email went on to say that "everyone in the database is working" and advises employees that unless they are "DEAD (or you have the Plague), you better be at your assigned event."

120.    Ultimate had crewed employees for Colorado Rockies, Denver Broncos, multiple college football games, and a music festival that week.

121.    Despite this one week in the fall of 2019 being potentially the busiest ever for Ultimate, Ms. Tessean was not crewed to work even once and had open availability for each day that week.

122.     The less Ms. Tessean works, the less likely she will work in the future, as well. Because Ultimate took work from Ms. Tessean, she worked fewer games where she could

network with other technical experts to find work with other teams and other sports. Often these

connections lead to larger opportunities, such as working the Olympic games.

123. Mr. Boileau's actions on behalf of Ultimate caused, and continue to cause, Ms.

Tessean economic damages in an amount to be proven at trial.

**FIRST CLAIM FOR RELIEF**
**Hostile Work Environment Based on Gender**
**in Violation of Title VII, 42 U.S.C. § 2000e, *et seq*. and**
**Colorado's Anti-Discrimination Act Against Defendants**

124. Plaintiff incorporates each of the allegations above, as if fully set forth herein.

125. Plaintiff was subjected to unwelcome and offensive harassment and

discriminatory conduct based on her gender and gender stereotypes during her employment with

Altitude and Ultimate.

126. Plaintiff's male coworkers created a hostile work environment for Plaintiff

because of their pervasive gender-based insults about Ms. Tessean's perceived promiscuity,

laziness, lack of knowledge of the strike process, and other offensive and aggressive conduct.

127. Defendants' unlawful harassment of Plaintiff was because of Plaintiff's gender

and gender stereotypes, resulting in an adverse impact to the terms and conditions of Plaintiff's

employment and subjecting Plaintiff to a hostile work environment.

128. This harassment was sufficiently severe and pervasive so as to unreasonably

interfere with Plaintiff's health, well-being, and work performance.

129. Defendants knew or should have known of the unlawful conduct of Plaintiff's

male coworkers and failed to take prompt, remedial action to stop the pervasive and offensive

conduct.

130. Plaintiff suffered severe emotional distress as a result of the hostile environment.

131.    In unlawfully discriminating against and harassing Plaintiff, Defendants acted willfully, wantonly, and/or with malice or with conscious and/or reckless indifference to Plaintiff's rights under the law, thereby necessitating the imposition of exemplary damages.

132.    As a further direct and proximate result of Defendants' unlawful behavior, Plaintiff has been compelled to retain the services of counsel in an effort to assert her rights and has, thereby, incurred, and will continue to incur, legal fees and costs, the full nature and extent of which are presently unknown to Plaintiff.

**SECOND CLAIM FOR RELIEF**
**Retaliation in Violation of Title VII, 42 U.S.C. § 2000e, *et seq.***
**and Colorado's Anti-Discrimination Act Against Defendants**

133.    Plaintiff incorporates each of the allegations above, as if fully set forth herein.

134.    On multiple occasions, Plaintiff engaged in protected conduct by voicing her concerns to Mr. Boileau and Altitude about the harassment and hostility she was facing in the workplace based on her gender and gender stereotypes.

135.    During the course of Plaintiff's employment with Defendants, Defendants, by and through their agents and employees, retaliated against Plaintiff in the terms, conditions, and privileges of her employment, including by refusing to hire her for future games.

136.    In unlawfully retaliating against Plaintiff, Defendants acted willfully, wantonly, and/or with malice or with conscious and/or reckless indifference to Plaintiff's rights under the law, thereby necessitating the imposition of exemplary damages.

137.    Because of Defendants' actions, Plaintiff has suffered loss of income (front pay and back pay), emotional distress, and other compensable damages.

138.    As a further direct and proximate result of Defendants' unlawful behavior,

Plaintiff has been compelled to retain the services of counsel in an effort to assert her rights and

has, thereby, incurred, and will continue to incur, legal fees and costs, the full nature and extent

of which are presently unknown to Plaintiff.

## THIRD CLAIM FOR RELIEF
### Negligent Supervision Against Defendants

139.    Plaintiff incorporates each of the allegations above, as if fully set forth herein.

140.    Defendants owed a legal duty to Ms. Tessean and her coworkers.  Altitude and

Ultimate each had a duty to prevent an unreasonable risk of harm to third persons as they knew

or should have known based on previous complaints about the general hostile environment and

about Mr. Milinkov's aggressive behavior specifically, that Mr. Milinkov would cause harm to a

coworker.

141.    Mr. Milinkov displayed aggressive attributes and prior conduct such that

Defendants should have known that retaining him created an undue risk of harm to those persons

he encounters while performing his job for Defendants.

142.    The seriousness of Mr. Milinkov's aggressive behavior created a foreseeable risk

and Defendants knew, or should have known, that Mr. Milinkov would physically harm one of

his coworkers.

143.    Defendants breached their duty by continuing to employ Mr. Milinkov and failing

to discipline him for complaints made about him prior to the January 25, 2018 incident.

144.    Defendants' breach of their duties caused Ms. Tessean injury.

145.    Mr. Milinkov did in fact assault Ms. Tessean, causing her injury.

146.     Plaintiff has suffered damages as a result of Defendants' failure to act reasonably, including economic damages in an amount to be proven at trial.

### FOURTH CLAIM FOR RELIEF
**Breach of Contract Against Ultimate**

147.     Plaintiff incorporates each of the allegations above, as if fully set forth herein.

148.     Ms. Tessean entered into a contract with Ultimate that, among other things, contemplated her safety in the workplace by assuring her that it "support[ed] [her] right to expect a safe environment."

149.     Ultimate breached its contract by continuing to employ Mr. Milinkov despite being aware of his aggressiveness and propensity to incite conflict in the workplace related to the strike process.

150.     Plaintiff substantially performed under the contract by performing her work competently.

151.     Ultimate failed to substantially comply and/or perform its duties under the contract to ensure Ms. Tessean's safety in the workplace by continuing to employ Mr. Milinkov after Plaintiff's complaints about his aggressive behavior and her report of the January 25, 2018 physical assault.

152.     As a result of Ultimate's breach of its contract, Ms. Tessean suffered damages in an amount to be determined at trial.

### FIFTH CLAIM FOR RELIEF
**Intentional Interference with Prospective Economic Advantage
Against Ultimate**

153.     Plaintiff incorporates each of the allegations above, as if fully set forth herein.

154.    Ultimate intentionally and improperly interfered with Ms. Tessean's prospective business relationship, here – her employment with Altitude and other sports teams and sports networks.

155.    Ultimate induced or otherwise caused Altitude and others not to enter into and/or continue their working relationships with Ms. Tessean, costing her significant income.

156.    Ultimate's interference was intentional as it was Mr. Boileau's sole decision who to crew as the EVS Operator for broadcast events.

157.    Ultimate's interference was improper because Mr. Boileau's motive in not crewing Ms. Tessean was to punish and/or retaliate against Ms. Tessean.  Ultimate's actions were supportive of and encouraged unlawful behavior in the workplace.

158.    Ultimate's position as the only crewer for certain sports teams and venues, and its deliberate refusal to crew Ms. Tessean after her report of physical assault by her coworker and because of her EEOC Charge, directly interfered with her ability to work for certain sports teams and sports networks.

159.    Ultimate's interference with Ms. Tessean's ability to work for Altitude, the Colorado Rockies, and other sports teams and sports networks caused her economic damages in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for entry of judgment in her favor and against Defendants as follows:

A.      Compensatory damages, including without limitation, back pay, front pay,

damages for loss of reputation, loss of opportunity for professional growth,

additional financial incidental and consequential damages;

B.      Non-economic damages for emotional distress, pain and suffering, humiliation,

inconvenience, mental anguish, and other non-pecuniary losses;

C.      Liquidated, exemplary, and punitive damages as permitted;

D.      Reasonable attorneys' fees and costs as provided by statute or applicable law;

E.      Pre- and post-judgment interest; and

F.      Such other and further relief as the Court deems just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL CLAIMS SO TRIABLE.**

Dated: December 27, 2019

By:     /s/ *Leah P. VanLandschoot*
        Leah P. VanLandschoot, #35723
        Amy M. Maestas, #46925
        THE LITIGATION BOUTIQUE LLC
        1720 S. Bellaire Street, Suite 520
        Denver, Colorado 80222
        T: 303.355.1942
        F: 303.355.2199
        Email: lvanlandschoot@thelitbot.com
        Email: amaestas@thelitbot.com
        **ATTORNEYS FOR PLAINTIFF**
        **KIMBERLEE TESSEAN**

**Plaintiff's Address:**
2396 South Bellaire Street
Denver, Colorado 80222